# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RONNIE LLEWELLY JORDAN, also known as
RONNIE LLEWELLYN JORDAN,

        Defendant-Appellant.

UNPUBLISHED
January 12, 2016

No. 323082
Wayne Circuit Court
LC No. 14-000706-FC

Before: SAWYER, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Defendant, Ronnie Jordan, appeals as of right his convictions following a jury trial of assault with intent to commit murder, MCL 750.83, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced him to 20 to 30 years' imprisonment for the assault with intent to commit murder conviction and two years' imprisonment for the felony-firearm conviction. Because we agree with defendant that his trial counsel rendered ineffective assistance of counsel and there is a reasonable probability that the result of the proceedings would have been different, we reverse and remand for a new trial.

## I. BASIC FACTS AND PROCEDURAL HISTORY

On September 2, 2013, Jason Foley was shot several times while at a Sunoco gas station in Detroit. The only evidence linking defendant to the incident is Foley. At trial, Foley testified that he was at the gas station to purchase narcotics from defendant, whom he knew as "J.R." According to Foley, he had known defendant for a little under six months and had purchased cocaine from him on approximately 20 occasions. All but one of their transactions took place at the same gas station. Although Foley had always initiated the prior transactions by calling defendant, on this night, Foley testified that defendant called him and offered to sell him drugs. Foley agreed to buy marijuana for $20.

-1-

Foley testified that at approximately midnight, he pulled his car up to a pump at the east side of the gas station. Two vehicles were also at the station, a gold SUV and a blue Chevy Malibu. Two unknown males were seated in the blue Malibu. Foley claimed to have previously seen defendant in the blue Malibu six months earlier during their one transaction that did not take place at the Sunoco gas station, although he did not connect defendant to the car on the night of the shooting. Foley testified that the driver of the blue Malibu "aggressively" tried to get him to purchase drugs from them, which he found strange because "[e]very time I go to Detroit to purchase narcotics, they always think I'm a cop." Although he kept trying to ignore them, Foley finally told them to "go get it" so they would leave. Foley testified that his conversation with the occupants of the blue Malibu took place through their open windows while they were seated in their cars. Foley did not get out of his car.

Foley testified that when the gas station parking lot was empty, he saw defendant approaching from a nearby alley, as he had done on every prior occasion when they engaged in a drug transaction. Defendant was wearing a black hooded sweatshirt. Foley then lost sight of defendant when a white car pulled into the gas station. After the white car left, a homeless man began banging on a blue metal donation box directly in front of Foley's car.

Foley next saw defendant approaching from the alley through his rearview mirror; defendant was running up to Foley's car with the hood of his sweatshirt pulled up and the strings pulled tight, covering the top of his head and his face from the ears back, although his eyes, ears, and nose were still visible. Foley looked through his right side mirror and saw that defendant was pulling out a gun from his pants. Foley put his car, which was still running, in drive and hit the accelerator. Defendant immediately began shooting; he was no more than five feet away and by the right rear door, according to Foley. Foley's side window broke, and he heard at least eight shots fired. As defendant fired, he was yelling something, although Foley could not discern what he was saying. Foley was hit in the back, causing him to lose feeling in his legs. He was also shot in the right middle finger, and "fragments" lodged in his wrist. Using his right hand, Foley pushed the accelerator to escape, looking up intermittently to see where he was going. He made it a mile down the road and stopped at the Hazel Park Police Department, where an ambulance was called. Hazel Park Police Officer R. Ackerberg[1] rendered first aid to Foley and directed Officer Michael Kasdorf to the crime scene to secure the area until the Detroit Police Department (DPD), who had jurisdiction over the gas station, could arrive.

At the hospital, police officers from the DPD spoke with Foley and prepared a two-page written statement, which Foley read and signed. He did not recall with certainty whether he told the officers at the hospital why he was at the gas station at the time of the shooting, or whether he told them who shot him, but he contended that he did describe the shooter. Foley contended that during his statement, doctors and nurses were trying to get the police officers out of the room so they could save his life. Foley underwent surgery to remove the bullet from his back.

---

[1] The officer's first name is not clear in the lower court record and appellate briefs.

On cross-examination, Foley admitted to various discrepancies between his trial testimony and what was contained in the written statement that he signed at the hospital. For example, he admitted that the statement did not mention his linking defendant to the blue Malibu. Further, it described a blue Impala, not a blue Malibu, although Foley contended that the bodies of those vehicles are nearly identical and the blue car was referred to as an Impala for much of the rest of his testimony. It did not mention that Foley linked defendant to the blue Impala. It did not mention that he had seen defendant with his hood down in the alley before temporarily losing sight of him. Most significantly, it did not identify defendant as the shooter. Rather, it indicated that he saw "a Guy" in his right mirror walking up wearing a hoodie with the hoodie over his head with the strings pulled tight. When asked to describe the shooter in his statement, he answered, "5'10" 180 Pounds Black male, Dark skin in his 20s," rather than by name. Foley admitted that his written statement only identified defendant (described as "J.R.") as the person he was meeting at the gas station at the time of the shooting. Foley explained the lack of references to defendant as the shooter in his statement by saying, "I think it's fair to say that I didn't write this [statement] and someone was trying to write down what I was saying." Foley admitted that when he saw the person with the gun, he was concerned about his safety, and his immediate reaction was to get out of the area as quickly as possible. Foley admitted that at the end of the statement, in response to the question, "Is there anything else you want to add to your statement," is written his response: "No sir, that's it." Foley also testified that he did not give a description of the shooter when he was at the Hazel Park Police Department. He also testified at trial that he had told the police the shooter had some facial hair, but on redirect and recross he agreed that in his written statement there is no mention of facial hair, and at the preliminary examination he testified that he did not tell police the shooter had facial hair. Foley also testified that the shooter was attempting to crouch down, or hide, as he approached Foley's car, and Foley did not observe the shooter for very long.

When answering questions posed by the trial court, Foley testified that he never got out of his car when buying drugs from defendant. Instead, he would remain in his car at a gas pump, defendant would approach on foot, and they would make their exchange at the driver's-side door. When the court asked Foley whether he sensed any anger or dissatisfaction in defendant's voice at the time of their phone call on the night of the shooting, Foley testified that he did not, but that the two had gotten into a fight a month earlier because Foley had refused to give defendant a ride after their drug transaction. Foley testified that defendant called the next day and apologized, offering to give him the rest of the drugs he had withheld at the time of their fight; Foley told defendant that he was trying to stop doing drugs and to never call again, provoking another argument. Foley testified that the night of the shooting (a month later) was the next time they spoke, that he had completely forgotten about their fight, and that defendant's call was "a complete setup" to shoot him. Foley admitted on recross that his written statement does not mention him having a prior fight with defendant (or "J.R." as he is referred to in the report), and he did not testify about the argument at the time of his preliminary examination.

Foley was questioned extensively at trial by defense counsel, the prosecutor, and the court about his interaction with the occupants of the blue Impala, including the distance between their respective cars, their placement between gas pumps, and whether the car windows were open or closed. The jury also asked a host of questions of Foley.

Officer Anthony Brown became the officer in charge of the case on September 3, 2013. He testified that in the course of his investigation, on either September 3 or 4, he went to the Sunoco gas station and attempted to obtain a copy of the gas station's surveillance video, but the system only stored video for 24 hours and it was no longer available. After Foley was out of the hospital, Officer Brown met with him and took a second statement from him, although it was not reduced to writing. Officer Brown testified that Foley told him about the prior argument he had had with defendant, and he identified defendant in a photographic lineup. Officer Brown also testified that defendant's address was one block away from the gas station.

On cross-examination, Officer Brown admitted that he did not mention in his report the fact that Foley had told him about a prior argument with defendant. When asked his understanding regarding how many people were involved in the shooting, Officer Brown stated his belief that there was only one. Defense counsel then undertook to question Officer Brown about the contents of Officer Ackerberg's report—which, as discussed in more detail below, contained a version of the events that significantly differed from Foley's trial testimony—but the court sustained the prosecutor's objections to his questions based on hearsay. Defense counsel pursued multiple additional attempts to get into the substance of Officer Ackerberg's report with Officer Brown, but was shut down on every occasion. Defense counsel finally undertook to make an offer of proof outside the presence of the jury, but the trial court still found that the evidence was hearsay from another officer, and thus, inadmissible when questioning Officer Brown.

After two more witnesses testified and the prosecution rested, and outside the presence of the jury, defense counsel indicated that he wanted to call Officer Ackerberg for impeachment purposes. Defense counsel stated that Officer Ackerberg "personally questioned Mr. Foley, and the information he got from Mr. Foley was -- and I'm gleaning this from his statement,[2] that he was jumped by -- he being Mr. Foley was jumped by two black males, no description given." In pertinent part, Officer Ackerberg's report contains the following description of events relayed by Foley:

> I asked FOLEY what had happened. He stated that he had been at the Sunoco Gas Station at 8 Mile Road & John R Road, Detroit. He stated that he was "jumped" by 2 B/M's (no description given). He stated that he was running to his car when he was shot in the back. He stated that he was able to get into his car and flee from the shooter/s to seek medical attention. FOLEY was not specific on what had led up to the shooting incident.

---

[2] It appears from the record that defense counsel had Foley's statement to Officer Ackerberg in his possession at the time of trial. Although the reasons for defense counsel's failure to do so are not clear from the record, the transcripts reveal that defense counsel did not attempt to impeach Foley by asking him if he recalled giving an inconsistent version of what happened to Officer Ackerberg or anyone else while at the Hazel Park Police Department immediately after the shooting.

Defense counsel stated that it was his intention to have Officer Ackerberg testify as to what Foley told him right after the shooting. Defense counsel admitted that he had not subpoenaed Officer Ackerberg, but stated that "as I listen to the testimony during the course of trial, I feel that testimony is important." The prosecutor noted that Officer Ackerberg was not endorsed as a witness by the prosecution. In response to the trial court's inquiry whether defense counsel had made some effort to contact Officer Ackerberg, defense counsel admitted, "[n]ot until now Your Honor. That's why I'm asking for him to be subpoenaed –as I see the trial now, I think that evidence is material to Mr. Jordan's defense," to which the trial court responded, "When was it ever not material?" Defense counsel contended that he was under the impression that Officer Ackerberg was going to be a witness in the case, and that he "honestly thought" he was going to be called by the prosecution. The trial court ordered the prosecution to assist in locating Officer Ackerberg and gave the parties until the next day to find him. Despite what the trial court found to be diligent efforts by both the prosecution and the DPD to secure Officer Ackerberg's presence at trial, such efforts proved unsuccessful. [3]

The defense called as a witness Sergeant Brandon Cole of the DPD, who testified that he took a statement from Foley at the hospital on the night of the shooting. Sergeant Cole testified that Foley was coherent when he gave his statement and that health professionals, who were in and out of Foley's room, did not tell Sergeant Cole to leave. According to Sergeant Cole, Foley stated that he was at the gas station to meet defendant for a $120 drug deal. Contrary to Foley's testimony at trial, Sergeant Cole recalled that Foley told him that *he*, not defendant, had set up the drug deal. Sergeant Cole admitted that Foley's signed statement did not identify defendant as the shooter, just the person whom he was at the gas station to meet, and that his report contained the words "unknown suspect." But, he testified that the phrase "unknown suspect" had been previously entered in the report by another officer and that Foley did identify J.R. as the shooter:

> Well, this unknown suspect is actually a bring forward from another officer's report. What happens with Crisnet[4] is every -- because of the way the system is set up, every officer's either victim, perpetrator, suspect, anybody that's named in a previous report has to be brought up in the follow-up reports. . . . So that's actually not mine. That was brought up from an earlier officer's report that put basically unknown suspect. I can testify today that the victim told me that J.R. is the one who shot him.

---

[3] The prosecutor tracked down Officer Ackerberg's cell phone number, as well as the telephone number of his lawyer, and left messages for each instructing that Officer Ackerberg was to appear in court the next day; the calls were not returned and Officer Ackerberg did not show up in court.

[4] It appears from the record that Crisnet is a type of system into which reports are entered, and that a "Crisnet report" is a preliminary report, which one law enforcement officer described at trial as "basically just a brief synopsis of what occurred, and it's basically saying who did what, when and where."

After the close of proofs and closing arguments, the jury deliberated and twice indicated that it was deadlocked. The trial court read the deadlocked jury instruction on the first occasion and adjourned for the day on the second occasion. The next morning, the jury rendered its verdict and convicted defendant as described above.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues on appeal that defense counsel was ineffective for failing to subpoena Officer Ackerberg to testify at trial, obtain the gas station surveillance video, subpoena the owner of the gas station, follow up on information regarding a different alleged perpetrator of the crimes, and object to the scoring of offense variables (OVs) 3, 4, 5, and 10 based on the court's use of judicially determined facts. As it pertains to counsel's failure to subpoena Officer Ackerberg, we agree, and find that counsel's failure in this regard prejudiced defendant, warranting reversal and a new trial.

To preserve a claim that his or her counsel was ineffective, a defendant must move in the trial court for a new trial or a *Ginther*[5] hearing. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). Defendant's claims are not preserved for appeal because he did not move for a new trial or a *Ginther* hearing in the trial court, and this Court denied his motion to remand for a *Ginther* hearing.[6] Accordingly, our review is limited to errors apparent from the trial court record. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Id.,* citing *People v. LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

To evaluate a claim of ineffective assistance of counsel, this Court uses the standard established in *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). *People v Hoag*, 460 Mich 1, 5-6, 594 NW2d 57 (1999), citing *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994). For a successful claim of ineffective assistance of counsel, the defendant must show that: "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2s 136 (2012). The effective assistance of counsel is presumed. *People v Roscoe*, 303 Mich App 633, 644; 846 NW2d 402 (2014).

Generally, "[d]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy . . . ." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). The failure to call a witness may only amount to ineffective assistance of counsel if it deprives the defendant of a substantial defense. *People v*

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[6] *People v Jordan*, unpublished order of the Court of Appeals, entered March 25, 2015 (Docket No. 323082).

*Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). "A substantial defense is one that might have made a difference in the outcome of the trial." *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009) (citation and quotation marks omitted).

Defendant's first criticism of his counsel is the failure to subpoena Officer Ackerberg for trial. Defendant contends that Officer Ackerberg was a critical witness for purposes of impeachment because his report regarding what Foley told him immediately after the shooting depicts an entirely different version of events. Defendant attached to his appellate brief Officer Ackerberg's report of his encounter with Foley, which, as noted above, states in pertinent part:

> I asked FOLEY what had happened. He stated that he had been at the Sunoco Gas station at 8 Mile Road and John R Road, Detroit. He stated that he was "jumped" by 2 B/M's (no description given). He stated that he was running to his car when he was shot in the back. He stated that he was able to get into his car and flee from the shooter/s to seek medical attention. FOLEY was not specific on what had led up to the shooting incident.

It is obvious from the record that defense counsel's failure to subpoena Officer Ackerberg was not the product of sound trial strategy. The fact that Foley gave an entirely different version of events concerning what happened to him at the gas station—immediately after those events occurred—is significant. As the trial court aptly quipped, "When was [this information] ever not material?" It is especially significant given that Foley's signed statement at the hospital also does not identify defendant as the shooter, just the person whom he was at the gas station to meet. On appeal, even the prosecution fairly concedes that defense counsel's error "arguably" fell below an objective standard of reasonableness because he mistakenly believed the officer was part of the prosecution's case in chief. Had defense counsel contacted Officer Ackerberg or subpoenaed him for trial, he could have discerned whether the officer's testimony would have mirrored his report, and thus, been helpful to impeach Foley with an initial version of events that differed from his subsequent, specific identification of defendant as the shooter.

Because defendant is able to demonstrate that counsel's performance was objectively unreasonable, we turn to the more difficult issue: can defendant demonstrate prejudice? Having reviewed the record and Officer Ackerberg's report, we believe that he has demonstrated the requisite level of prejudice. At the outset, we note that the only evidence linking defendant to the shooting is Foley. Thus, Foley's credibility was paramount to this case. And, we note that the jury already had reason to question Foley's credibility even without any information Officer Ackerberg could have provided, given some of the discrepancies in Foley's testimony and the lack of specificity regarding defendant in Foley's statements to police officers. For instance, defense counsel undermined Foley's credibility by highlighting differences in his trial testimony and his pre-trial statements, such as his statement to police officers that he, not defendant, arranged the drug transaction. This cast doubt on Foley's contentions that defendant called him and facilitated the drug transaction as a "set-up" to shoot him. In addition, Foley's written statement does not identify defendant as the shooter, only the person whom Foley was scheduled to meet at the gas station at the time of the shooting. In fact, Foley's statement refers to the shooter simply as "a Guy"—not defendant or "J.R." That Foley's statement does not identify defendant as the shooter is undeniably significant, as there is no indication in the record that Foley ever attempted to be deceptive or obtuse with regard to the shooter's identity because he

was embarrassed about the fact that he was at the gas station to buy drugs. This fact lends credence to defendant's claim that Foley at some point decided that defendant must have had set him up, and hence, he identified defendant as the shooter. Further casting Foley's credibility in a negative light is the prosecutor's concession during closing argument that Foley "lost his cool" during his testimony.

As our Supreme Court has observed, "[w]here there is relatively little evidence to support a guilty verdict to begin with (e.g., the uncorroborated testimony of a single witness), the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt." *Trakhtenberg*, 493 Mich at 56 (citation and quotation marks omitted). In this case, Officer Ackerberg's report—which contained Foley's first statement after the shooting—told a considerably different version of events than the version Foley presented at trial. The report contained a different number of alleged perpetrators. It had Foley out of his vehicle and being "jumped" by two black males, causing him to be "running to his car" when shot, instead of sitting in his car being snuck up on by the shooter as observed through his rearview and side mirrors. In addition, Foley's statement to Officer Ackerberg that he was shot in the back while running could also cast doubt on Foley's ability to see who shot him. Furthermore, the line in Officer Ackerberg's report about Foley being "jumped" while at the gas station would have provided crucial support for defendant's theory in closing argument that Foley went to the gas station with cash to purchase drugs and that unknown individuals saw the cash and seized the opportunity to try and rob him.[7] Without the assertion that Foley was "jumped" by two individuals, defendant's theory was essentially supported only by supposition and inferences that the gas station, which was reported to be a high-crime area, could have harbored the types of individuals who would have robbed him. However, with the assertion that Foley was "jumped," defendant's theory would have gained considerably more traction.

We believe that the information in Officer Ackerberg's report is significant enough to show that counsel's failure to subpoena Officer Ackerberg deprived defendant of a substantial defense, i.e., one that could have made a difference in the outcome of the trial. See *Chapo*, 283 Mich App at 371. This conclusion is supported by the fact that the jury was twice deadlocked. While we acknowledge that the information in Officer Ackerberg's report was additional impeachment evidence, we do not agree with the prosecution's assertion that anything Officer Ackerberg could have added would have been merely cumulative impeachment evidence that would not have made a difference at trial. The information contained in Officer Ackerberg's report was *additional*, not cumulative, impeachment that would have further called into question Foley's credibility in a case where he was the only eyewitness and only link pointing to defendant in the case, thus making his credibility even more crucial to the outcome. We conclude that there exists a *reasonable* probability that this additional impeachment witness " 'would have tipped the scales in favor of finding a reasonable doubt about defendant's guilt,' " *People v Trakhtenberg*, 493 Mich at 57, quoting *People v Armstrong*, 490 Mich 281, 292; 806

---

[7] Police officers recovered $121 from the front seat of Foley's car. Foley claimed to have only $20 out of his wallet and placed by his leg in preparation for the drug exchange.

NW2d 676 (2011), and that defendant can establish the requisite level of prejudice to warrant reversal and a new trial.

Reversed and remanded for a new trial. We do not retain jurisdiction.[8]

/s/ David H. Sawyer
/s/ Jane M. Beckering
/s/ Mark T. Boonstra

---

[8] Because of our resolution of this issue, we need not address defendant's remaining arguments.